Good morning, your honors. May it please the court. I'm Lisa Counters and together with Kevin Kelvill, we represent Mary Linich in connection with this claim. We presented three issues for review on appeal. The first issue essentially disposes of the case. The first issue is that there is no unambiguous grant of discretion in the plan documents that runs from Towers-Perrin to Broadspire Services. This court has ruled that the delegation has to be unambiguous, and if the decision-maker is not the one granted discretion, de novo review applies. The only connection you get to granting discretion to Broadspire Services is in a document that is not a plan document. The statute is clear under 29 U.S.C. 1105 c 1 b that a plan instrument is a document under which a plan is established or maintained. There is no question that there was a summary plan description, and the 2003 summary plan description is the plan description that's applicable here. And later during discovery, the Towers-Perrin paid plan shows up, which is also a 2003 document. Both of those plans establish and maintain the plan. The service agreement that comes up and that is referenced in the judge's second decision on the standard of review is not a plan document and only grants discretion from Towers-Perrin to Broadspire Services. It is not a document under which the plan is established or maintained. Even the cases cited by Broadspire in the early briefing, Castillo v. Cigna, Gross-Solomon, talk about when you look for a grant of discretion, that grant of discretion needs to be in the plan documents. These plan documents grant discretion from Towers-Perrin, the plan administrator and the employer, to the plan administrative committee. We now know through discovery that the plan administrative committee is simply a ruse. The plan administrative committee has not existed, has not made a decision on a claim, and has not evaluated a claim since 1999. Despite that fact, Broadspire Services continues to maintain that there is this plan administrative committee somewhere in the final denial letter, which is contained in the excerpt of record at 59-7 at page 1092. That document is signed by Broadspire on behalf of the plan administrative committee. There is no plan administrative committee. That is the only entity that has been delegated discretion in this case by the plan documents. What about the power of the employer to allocate fiduciary responsibilities according to the plan? Right. That plan document allocates the specific responsibility for making claims decisions to the plan administrative services committee. Exclusively? Exclusively. And what the plan document... Let me make sure I'm talking about the right plan document. Yes. The plan administration committee had the... Let's see. The committee was the plan administration committee. Where in there does it say only the plan administration committee can make decisions regarding disability determination? In that document, the plan gives the plan administrative committee the option to... It divests Towers-Perrin of the option and gives the plan administrative committee in the plan document the option to delegate to other people, but it cannot delegate fiduciary duties. Right. But it doesn't say that the plan committee is the only entity that can make determinations regarding disabilities, does it? Does it contain those words? No. But it does contain the fact that under the plan documents that it is the plan administrative committee that has delegated the duty. And if that's the case, then the delegation has to be from the plan administrative committee to Broad Spire Services. Well, Towers-Perrin still had the ability to allocate fiduciary responsibilities other than trustee responsibilities. Other than fiduciary responsibilities. No. No. Towers-Perrin had the authority to allocate fiduciary responsibilities other than trustee responsibilities under the plan. Right. But to the extent that the previous sections of the plan document indicate that it has the right to allocate fiduciary duties that aren't otherwise allocated, the only person that's allocated the duty to handle claims in that document is the plan administrative committee. But if we read both of those together, it doesn't say only the plan committee can do that. So if Towers-Perrin had residual authority to allocate fiduciary responsibilities, why couldn't it do so through the service agreement? Because I think that when you have a specific grant of authority in the document, the later parts of the document that you're speaking of, Your Honor, talks about that they have the right to allocate fiduciary duties that aren't otherwise already allocated. It doesn't say it's not otherwise allocated. But they've already allocated the fiduciary duty to the plan administrative committee. How does the, how do you know from that that we can, we can allocate it to the plan administrative committee, but then we can change our mind and allocate it to someone else at a later time? Because apparently that's what happened in this case. And so if the plan document does not preclude the employer from doing that, then how can we say that it was, it didn't have the authority? Because I, I have to go back to the fact that the committee, that they designate specifically to the committee the agents to do other things than fiduciary duties, and they designate specifically to the committee to authorize payment of benefits and make claim determinations. But we know the committee didn't do that. So are you saying that the plan assumed there would be a vacuum in that? It's a mystery to me how, there has to be a vacuum. The problem is these two documents, the two plan documents that they rely on are 2003. And they still continue to refer to an entity that hasn't existed or operated since 1999. To me that militates toward the view that there was residual authority to allocate the responsibility by the employer, and the employer chose to do it through the services agreement. To me that's a more reasonable interpretation of the plan than to interpret the plan to evidence a vacuum in, in delegation. I guess the problem is, Your Honor, then why put in plan documents that are supposed to inform and advise the plan participants of how their claims are going to be handled and who has discretionary authority? There's still no grant from Towers Perrin to Broadspire Services in those plan documents. It comes in a non-plan document. Well, let's, let's assume that there was a delegation. Yes. Now let's talk to the, let's talk about the decision to terminate the benefits. Because that's really what we're here for, aren't we? So what, what's, what is the, what are the problems with the, with the determination? Well, I think it's clear from the district court's opinion that the first two determinations are not consistent with, with the RISA regulations. The problem, I think, in the district court's decision, Your Honor, is that it, it, it didn't properly apply this court's instructions on how to conduct an abusive discretion review appropriately. The court ultimately did, went back to the decision of this court in Jordan that on more than one occasion since abating, this court has rejected the Jordan versus Northrop Grumman decision as the fact that the any reasonable basis standard no longer applies. And in fact, what it requires is a searching review of the record where you consider not only the conflict of interest, but other factors. And what do you want us to do? I, I, let's look at the determination. I, we're trying to figure out whether, what, what should happen. Sure. With respect to the, if the court doesn't determine that de novo review is appropriate, well, if the court determines de novo review is appropriate, it needs to be remanded to the district court. The same result needs to happen with respect to the ultimate determination of the district court. The district court needs to review the record with the appropriate instruction from this court on considering the other, not just simply going back to the, if there was any reasonable evidence. There's, yeah, but there's no point in doing that unless there's going to result in some, as a practical matter, in some benefit to your client. So what in the determination, the fraud spire was wrong? Several things, Your Honor. First of all, with respect to the social security determination. Contrary to the intel plan, this plan has no, no information contained in it that says we don't defer to social security and it doesn't matter. And in fact, in this case, Ms. Lineage was immediately awarded a social security award, and in fact, during the claims process, was re-reviewed and re-confirmed as eligible for social security benefits. And so fraud spire didn't discuss it at all? There was no discussion in the record at all. And this court in Montour says you have to at least grapple with the decision. And if you look at all of the reviewers, fraud spire likes to say, you know, eight out of all these doctors reviewed the claim and determined that Lineage was not disabled. Not a one of them mentions the fact that she was disabled by social security. What else is wrong with it? Fraud spire conducted an inadequate investigation. If you look at the decisions of their, you know, multiple reviewers, okay, you review whether she's disabled from an endocrinology standpoint. Another doctor reviews if she's disabled from a psychological standpoint. There was infectious disease reviews and rheumatology reviews. And if you're only looking at that one piece, first of all, Mary Lineage never claimed to be disabled from diabetes. She never claimed to be disabled from any psychiatric disability. She claimed to be disabled from chronic fatigue syndrome and fibromyalgia. And so if you only parse out those simple, those few pieces, half of the reviewers they use make no difference. But if you look at those review decisions in the first review and even in the second review with another group of four physicians, they all, many of them review to the fact that, well, there's no objective evidence. Well, that's a problem with chronic fatigue and fibromyalgia. Now, the court made the distinction, well, there's no reason she couldn't produce, you may not have to produce objective evidence of disability, but you have to produce objective evidence of functional capacity. How do you do that with fibromyalgia and chronic fatigue? How do you measure fatigue? Or how do you measure pain? This court in Sanfon talked extensively about the fact that you can't measure pain. There is no evidence in the record that questions Mary Lineage's credibility, the consistency of her complaints, and to that extent, and there was no deference given to that by any of the reviewers or Broadspire ultimately. And in fact, the reviewers refer to the fact that, well, it's imperative you get objective evidence of this disability and indicated a neuropsych evaluation or a functional capacity evaluation, yet Broadspire never asked for the very evidence that its reviewers told them it needed to ultimately evaluate the claim. The other, some of the other deficiencies is the fact that ultimately that Lineage failed or that Broadspire failed to give all of the treating physician reports to the reviewing physicians. And in fact, one of the reports goes back to a 1999 IME done initially when Mary Lineage claimed disability and said I'm going to rely heavily on that report in 2004. Yet in 1999, Broadspire, or at the time who was ever handling the claim, did that IME that found that there wasn't a disability, did another one because that IME conflicted with the treating physicians. The second IME performed by Dr. June, infectious disease expert, says she is disabled. So now you've got doctors in 2004 going all the way back to 1999 relying on evidence that Broadspire and Tower's parent relied on was sufficient to prove her disability, and they're now saying in 2004 that it's insufficient. And that's why I'm going to stray in its briefing when it talks about the fact that, well, we're entitled to do a new evaluation when the disability definition changes. The problem here is that under the terms of the plan, Mary Lineage became disabled in July of 1999. She had 130 weeks or 18 months. Her test change was in February of 2001. This doesn't occur until 2004. This isn't a test change evaluation. This is an evaluation after they had paid her for almost three-and-a-half years under the any occupation definition. So she's ultimately continues, they're paying her, and now they're saying that there's a test change evaluation in 2004, but that's simply not the case. Okay. You have about a minute left, and the light has gone out up there. Oh, a minute 30. I'll come back for my rebuttal. Thank you very much. The light, we're not seeing anything. We're not seeing any time light. Now you get to earn your pay. Oh, man. Yes. We'll have to do it the old-fashioned way. Yeah, we'll start. We need a timekeeper. I've got a little one, two, three go. Your Honor, I do see the time on the clock here. You can see it. I can see it. We can't see it. Okay. Can we trust you? I'll do my best. Probably not. Probably not. Okay. Fifteen minutes. You may proceed. Fifteen minutes? Yeah. Thank you, Your Honor. Good morning. May it please the Court. My name is Joseph Adams of the firm of Snell and Wilmer, and I represent the defendants and appellees in this case, Broadspire Services, Inc., and Towers Perrin Long-Term Disability Plan. Your Honor, in this case, the district court did exactly what's required under the law of this circuit. As you know from the briefing, this circuit's en banc decision in Abati was issued while this case was in its early stages. And while the issue of standard of review was being briefed, the decision came down. Ms. Linich and her counsel brought the decision to the district court's attention, and the court, in response, set up a phased litigation plan. First, the court allowed Ms. Linich to take discovery outside the administrative record. Then the court allowed briefing and evidence to be presented on how the court should review this case in light of Abati and how to account for any conflict of interest, and then set up a time for dispositive motions. During that time frame, Ms. Linich took wide-ranging discovery. The initial period of conflict of interest discovery was set for 45 days. We stipulated to a couple extensions, and as a result, she had about 105 days to take discovery. After reviewing all of that evidence in the briefing, the district court held that discretion was conveyed from the employer, Towers Perron, to the administrator, Brodspire, and that the standard of review was abuse of discretion. And significantly, the court also held that there was no conflict of interest. And when that decision came down, Ms. Linich and her counsel did not seek reconsideration of that order. They did not challenge that order in any way. The district court held there was no conflict of interest in this case. And that significantly affects how the court reviews the administrator's decision on summary judgment. On the motion for summary judgment, the court reviewed the record and determined that Brodspire had conducted a full and fair review. That review process consisted of an initial review by an independent doctor, a subsequent review by four independent doctors in four separate disciplines, and a second level of review by another four doctors in four separate disciplines. But, counsel, this is kind of unusual in a way, because we're dealing here, correct me if I'm wrong, but I think we're dealing here with determination of benefits? That's correct, Your Honor. After and a change of the company that's doing the determination? Something changed. What changed was the definition of disability. Under the terms of the plan, for the first 130 weeks, all that Ms. Linich had to show was that she could not do the particular job that she had. After 130 weeks, the definition changed, and she had to show that she couldn't do any job for which she was reasonably suited. Somehow I was under the impression that Brodspire didn't do the original determination. I don't believe that they did, Your Honor. I don't have that information right in front of me, but I think the initial review took place in 1999. Yeah. And the services agreement at issue was after that. Okay. Let's see.  And I think that Judge Rawlinson's questions really go to the heart of the matter in terms of how the delegation works. We think it's fairly straightforward. Within the plan, there is a definition of applicable plan. It describes expressly the third-party administrator contract, the summary plan description, and the company policies on the benefits website. Under the express terms of the plan, these are all things that govern disability determinations. And throughout the plan, there are numerous references to the third-party administrator. And in fact, Section 2.9 of the plan provides that the third-party administrator contract controls over the summary plan description and over the company policies on the benefits website. And probably the most important section in terms of delegating authority is Section 6.2bI, and that is the provision that allows Towers-Perrin to designate additional fiduciaries. Well, what's your response to opposing counsel's argument that the previous paragraph that designated the plan committee usurped any other delegation? My response is that there's nothing in the plan that provides that that delegation of authority to the committee was exclusive, nothing in the plan at all. And in fact, that particular language is very similar to this Court's decision in Safon v. Wells Fargo, which is cited in both of the briefs extensively. In that case, discretionary authority was granted to multiple fiduciaries, and within the plan document itself, the plan administrator was not referenced by name, but rather there were numerous references to the plan administrator. And in that case, the Court held at page 866 that the administrator was one of the plan fiduciaries and that discretion was conveyed unambiguously. Okay. What about the – why don't you address the decision itself and the claims that it was improper, particularly the failure to talk about social security determination and the review of the same evidence that had been the basis for the determination earlier that she was entitled to benefit? Sure. And, Your Honor, what ERISA requires under the statute is that the administrator provide the plan participant with adequate notice of the reasons for denial. And we think that the numerous communications here did exactly that. The process itself was very substantial. There were a number of different doctors that looked at this under a variety of disciplines. And we've heard Ms. Linich's counsel criticize the fact that people looked at these from narrow disciplines, but that's not the case. In fact, what Broad Spire was trying to do was to look at it from just about every possible perspective. We looked at it from an infectious disease perspective. We looked at it from a rheumatology perspective, which in this Court's decision in Jordan said that that is the specific specialty that pertains to fibromyalgia. With respect to the social security determination, it was something that was considered by the reviewers. It is mentioned in a number of the documents as something that people looked at. It is not expressly discussed, but nor is there any particular duty on the part of the administrator to discuss every piece of evidence. We've heard citations to the Glenn case and the Montour case, but Glenn was a very different scenario. Glenn was the Supreme Court decision. And what went on in Glenn was that the insurer specifically told the claimant to go seek social security benefits, and in that case even referred the claimant to a law firm to help her get those sorts of benefits. And what the Court said was that was inconsistent. You can't, on one hand, encourage people to go out and obtain social security benefits and then never explain why you went a different way. And that's not the case here. There's no evidence in the record suggesting that anyone at Towers, Perrin, or Broadspire was urging this lineage to go out and seek social security benefits. But more fundamentally, both the Glenn decision and the Montour decision involved structural conflicts of interest. That is, that's the case where both the same entity both funds the plans and makes benefits determination. Kagan. So your position is that even though in Montour we said complete disregard for the SSA raises questions about whether it was a product of a principled reasoning process, that even though we said that, that because that was a conflict of interest situation and this is not a conflict of interest situation, that we, that they, that they, whoever is determining the issue is free to disregard, completely disregard the social security? Well, Your Honor, I would agree that the two situations are different because, as you mentioned, in Montour there was a conflict of interest. And what this Court's en banc decision in Abadie says is that there's a more searching review when there's a conflict of interest. You have to account for that as you do these. Does that mean that they don't have to consider? They could just disregard the social security? No. It doesn't mean that they have to disregard it. And that's not the case here. Because if we look at the record, we see that the reviewers did look at the document. But there is no discrete burden of explanation as these. Well, they didn't. They may have looked at it, but they didn't say anything about it. And you're saying they don't have to say anything about it.  Just like any other piece of evidence, an examining doctor's report or a picture of the applicant out in the garden or something. I think that's right, unless there are other circumstances that warrant it. For example, if you have a situation such as Glenn where there is some conduct on the part of the insurer or the employer saying, you know, you really ought to go out and apply for social security benefits. If there is that sort of action, I think there might be more of a need to explain it. If there is a structural conflict of interest, such as the case of Montour or Glenn, then there might be more of a need to explain additional pieces of evidence you might not have to account for if there were no conflict of interest. But here, there is no conflict of interest, and the district court got the standard exactly right, which is to affirm the administrator's decision under an abuse of discretion standard if there's any reasonable basis for doing so. Counsel, the district court found that the April and May 2004 decisions were defective. You don't challenge that? Well, I don't agree with that. In particular, they were focusing, the district court was focusing on the initial review that was performed by Dr. Zide. And if you look at the opinion of Dr. Zide, he was working with a very limited record. Exactly. And what happened was that Broadspire initially requested that both Ms. Lindish and her doctors provide information about her recent medical history. Those requests were initially ignored. There was numerous follow-up. I think eventually they did get some documents. When Dr. Zide was doing his initial review, he tried to call the treating physician. He tried a number of times. Eventually, he did get the treating physician on the phone, but that person didn't have her medical file at all. And at some point, he had to give his decision. And he even indicated in there, look, I'm working from a limited record. And this circuit's decision in Jordan makes it clear that that's not the administrator's responsibility. The administrator did what it could to get the information, but in the end, it worked with what it had. But you didn't file a cross-appeal on that point? No, we didn't, because we think that the ultimate review, the entire review process, to the extent there were any deficiencies with the limited record, the very substantial review that took place after Dr. Zide, there was the first appellate process with four independent doctors, and then the second appellant process with another four independent doctors, who looked at the entire claim file, who looked at all the information that the splenage said Dr. Zide should have had. That was looked at, and it was considered, and it was accounted for in both the denial that took place after that and the final denial that was the subject of appeal to the district court. But wouldn't Ms. Lineage have been entitled to a continuation of benefits until the denial that cured the defects, at least in the district court's mind, were remedied? I don't think so, because the full and fair process took place. It did eventually take place, and there was no determination in the meantime that that was deficient. What was being appealed to the district court? There was no determination that what was deficient. There was the determination by the district court was that the entire process gave Ms. Lineage a full and fair review. But she said that, yeah, but she said that the initial denial was defective, and so if there were no valid denial at that point, why shouldn't the benefits have continued until that point? Well, I guess, first of all, we haven't seen any authority from Ms. Lineage that provides for that narrow continuation of benefits. But more generally, we agree with the district court that to the extent there were any problems with Dr. Zide's report, they were cured by the full and fair review that took place after the fact. And any problems that did occur with Dr. Zide's review were not of Dr. Zide or Broadspire's doing. It was the fact that he could not obtain the medical records from the treating physicians, which he asked for and which Broadspire asked for. And I believe that in the record there's a letter from Broadspire to Ms. Lineage telling her, hey, we're trying to get this information from your doctors. They haven't responded. Maybe you could help. They did what they could reasonably to obtain that information, but in the end, they had to make a decision. And as this Court noted in Jordan, it's not the responsibility of the administrator to follow up repeatedly again and again and again to the treating physician. My problem with your argument is the district court didn't buy that. You explicitly found that the initial denial was defective. And I'm looking at our case, Panbecker v. Liberty Life, 2008 case, and it says, if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions. So what are we to make of that language from the Panbecker case in view of the district court's finding that the initial termination was defective? Sure. And first of all, I will note, bearing in mind my responsibility for the clock, my time is about to run out. Right. But to answer your question, I think that, first of all, as I said, it wasn't Dr. Zide's fault. We think that the district court got it wrong on that particular point and that the district court was correct in holding that it was a full and fair review. I think under the circumstances, Dr. Zide and Brodsbier did everything that they could. Well, but that doesn't mean that there was a proper determination by them. Okay. You have used your time. Thank you, Your Honor. Thank you. Just a second. Technical assistance. No problem. Are you going to do something magical? Unplug it and plug it back in. It has no relationship to anything, but it seems to have numbers. Oh, there we go. How about that? Thank you. Thank you. Okay. Good work. Voila. All right. You have a minute and 27 seconds. Thank you, Your Honors. I want to pick up where Your Honors left off, and that is with Pannebecker. I know Pannebecker. That was our case on appeal. And Pannebecker says exactly what you say it says, Judge Rawlinson. Until the final decision that the court found was appropriate, at the very least, Mary Lineage is entitled to benefits up until that determination. Because the court ruled, and there was no cross appeal, that those initial decisions were defective. Let me return back to the issue of delegation. The problem is, if you get to the services agreement and you say that's a proper delegation, you still have to understand that the services agreement specifically says that Broad Spire is not designated the plan administrator. Broad Spire is not a plan fiduciary, as those terms are defined under ERISA. So there's no proper delegation to make them a plan administrator or a claims fiduciary. They're simply acting as an agent of Towers Perrin. And that's contained in the service agreement, which is contained in Excerpt of Record 49-3. I think that they read the decision in this court too narrowly in terms of conflict of interest. What happened is the court conflated the conflict of interest. The court required us to come forward with the smoking gun that Atwood said you had to come forward with. This court made clear an abatee isn't required. What Lineage did come forward is the fact that there was no consideration of the Social Security decision and multiple other defects in the record. Thank you very much. Thank you. The case just argued is submitted, and the court does appreciate counsel's arguments and patience in dealing with some defective technical equipment.
judges: Moody, Schroeder, Rawlinson